UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAXINE BLOCKER-BURNETTE, <br><br> Plaintiff, <br><br> v. <br><br> THE DISTRICT OF COLUMBIA, <br><br> Defendant. | Civil Action No. 09-1185 (JEB) |

**MEMORANDUM OPINION**

In November 2007, Plaintiff Maxine Blocker-Burnette was terminated without cause from her job at the District of Columbia's Addiction Prevention and Recovery Administration (APRA) after approximately 29 years of service. She was 59 years old at the time and was responsible for caring for her daughter and father – each of whom had significant health problems. A few months before Blocker-Burnette was fired, 32-year-old Tori Fernandez-Whitney was appointed to run the agency. Fernandez-Whitney quickly determined that APRA needed to be reorganized and began implementing a plan to do so. As part of the plan, the Medicaid Division was dissolved, and many of its staff members, including Blocker-Burnette, were transferred to the Assessment and Referral Center (ARC). Soon thereafter, Fernandez-Whitney terminated Blocker-Burnette.

Representing herself, Blocker-Burnette filed an action against the District of Columbia alleging discrimination on the basis of age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and on the basis of family responsibilities, in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et seq*. The District has now moved for summary judgment. As Blocker-Burnette has presented evidence

1

that Fernandez-Whitney's purported reasons for discharging her were a pretext for age discrimination, the Court finds that Plaintiff's age-discrimination claim related to termination withstands summary judgment. By contrast, there is virtually no evidence that she was reassigned to the ARC because of her age or terminated because of her family responsibilities; the Court will, accordingly, grant summary judgment on those claims.

**I.      Background**

From 1978 until her termination on November 8, 2007, Plaintiff was employed by APRA, which coordinates substance-abuse prevention and treatment programs. See Compl. at 1, 3. In 2000, she became APRA's Medicaid Program Manager. See Mot., Exh. 9 (Deposition of Plaintiff) at 25, 30; Compl. at 1. Her duties in that position included helping to write "the state planning amendment for Medicaid," by which APRA would seek approval to receive Medicaid reimbursement, and overseeing the billing of Medicaid services for Temporary Assistance for Needy Families (TANF) recipients entitled to Medicaid services for substance abuse treatment. See Pl. Dep. at 30-44.

On June 25, 2007, Tori Fernandez-Whitney was appointed Senior Deputy Director of APRA, the agency's highest ranking position. See Mot., Exh. 10 (Declaration of Fernandez-Whitney), ¶ 2. Prior to her appointment, Fernandez-Whitney was a member of D.C. Councilmember David Catania's staff, and in that capacity, she served as Deputy Committee Clerk and Policy Director for the City Council's Committee on Health, which oversees APRA. Id., ¶ 3. During her tenure, KPMG, an independent auditing firm, was commissioned by the Department of Health "to conduct an organizational assessment" of APRA. See Mot., Exh. B (KPMG Report) at i. It published its report on April 20, 2007 – about two months before Fernandez-Whitney left Catania's staff. Id. The report discusses a host of agency shortcomings,

including deficiencies in its policies and procedures, budget management, and staffing. Id. at 11-18.

Fernandez-Whitney was aware of the KPMG report when she started in her position at APRA, and thereafter she observed firsthand many flaws in the management and operations of the agency. See Fernandez-Whitney Decl., ¶¶ 4-6. With respect to the Medicaid Division, in which Blocker-Burnette worked, Fernandez-Whitney noted that, with the exception of two pilot programs, APRA was not approved to receive Medicaid funds. Id., ¶ 8; see also Pl. Dep. at 40. The Division had been seeking Medicaid approval for at least six years – to no avail – when Fernandez-Whitney became Senior Deputy Director. See Pl. Dep. at 35; Fernandez-Whitney Decl., ¶¶ 8-9. Fernandez-Whitney also observed that "there were people with clinical backgrounds that were not working in a clinical capacity even though APRA had deficiencies in staffing in clinical areas." See Fernandez-Whitney Decl., ¶ 7.

Based on her own observations as well as KPMG's findings, Fernandez-Whitney determined that the agency needed to be reorganized, in what she refers to as a "functional realignment." Id., ¶ 10; see also Mot., Exh. C (Letter from Fernandez-Whitney explaining functional realignment). As part of the realignment, the Medicaid Division was dissolved, and the Assessment and Referral Center – which "is the central portal for District residents' entry into treatment programs" – was expanded. See Fernandez-Whitney Decl., ¶¶ 11-12.

In early October 2007, Blocker-Burnette and her staff in the Medicaid Division were transferred to the ARC. Id., ¶¶ 13-14. The ARC assesses clients' treatment needs and determines their financial eligibility for APRA services. Id., ¶14. If the person qualifies, the ARC issues him a voucher, which allows him to get treatment from the provider of his choice. Id. According to Fernandez-Whitney, Blocker-Burnette was assigned to be the Manager of

Voucher Services – a position Fernandez-Whitney believed she was qualified for because she was a licensed professional counselor. Id. Blocker-Burnette contends, however, that she was never given a new title; she was simply told to report to Charles Brown and "he would explain what [her] duties were." Pl. Dep. at 77, 87.

Shortly after assuming her position in the ARC, Blocker-Burnette was asked to cover some of the tasks of her direct supervisor, Charles Brown, while he was away. See Opp., Exh. 1 (October 2007 email exchange regarding Blocker-Burnette's duties in Brown's absence). Among other things, she would be responsible for "administrat[ing] voucher production" and performing "clinical reviews and intervention" in his absence. Id. Replying to an email from Brown describing these duties, Blocker-Burnette wrote that she had "never performed clinical treatment" and that she had "had limited training on vouchers and no training as a super user with the current duties [Brown] utilize[d] as a supervisor." Id. She nevertheless stated that she would "perform the duties as well as [she could]." Id. Blocker-Burnette copied Fernandez-Whitney on this correspondence.

Two days later, on October 17, 2007, Fernandez-Whitney instructed Larry Ricks, a Program Manager, that "effective immediately and until Mr. Charles Brown returns from training," he would "act as the Program Manager for the Assessment and Referral Center." Mot., Exh. H (Memo Delegating Authority to Larry Ricks). She indicated that her memorandum "supersede[d] all previous delegation of authority." Id. Fernandez-Whitney later explained that the representations in Blocker-Burnette's email, though "in direct conflict with Ms. Blocker Burnette's credentials as a licensed professional counselor," led her to believe that Blocker-Burnette "was not qualified to cover the additional responsibilities in Mr. Brown's absence." See Fernandez-Whitney Decl., ¶ 15. They suggested, furthermore, that Blocker-Burnette "was

4

not qualified to carry out the duties of her assigned position as Manager of Voucher Services." Id.

Fernandez-Whitney was also dissatisfied with Blocker-Burnette because she failed to attend a meeting Fernandez-Whitney had scheduled for October 12, 2007, and, according to Fernandez-Whitney, had not notified her of her inability to attend. Id., ¶¶ 17-19. Blocker-Burnette maintains that she informed her direct supervisor, Charles Brown, that she could not be at the meeting because she had to take care of her father and daughter. See Opp. at 8. Brown confirmed this and indicated that he reported Blocker-Burnette's reasons for not being able to attend the meeting to Fernandez-Whitney. See Opp., Exh. 5 (July 2011 email exchange between Blocker-Burnette and Brown).

On October 24, 2007, at age 59, Blocker-Burnette was given written notice that she would be terminated, effective November 8, 2007. Mot., Exh. A (Termination letter to Blocker-Burnette); Pl. Dep. at 9. On June 9, 2009, she filed this action against the District of Columbia alleging discrimination on the basis of age and family responsibilities. The District has filed a Motion for Summary Judgment, which the Court considers here.

## II.   Standard of Review

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. Holcomb, 433 F.3d at 895; Liberty Lobby, Inc., 477 U.S. at 248. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, Inc.,

477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." Taxpayers Watchdog, Inc., v. Stanley, 819 F.2d 294, 297 (D.C. Cir. 1987). When a motion for summary judgment is under consideration, "the evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [her] favor." Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, Inc., 477 U.S. at 249-50.

   **III.**   **Analysis**

      A. Termination

           1. *Age Discrimination*

Blocker-Burnette's central allegation is that she was terminated based on her age in violation of the ADEA. The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Individuals 40 years of age and older are included in the protected class. Id., § 631(a). In the absence of direct evidence of discrimination, ADEA claims are evaluated under "the familiar three-step burdenshifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 … (1973)." Paquin v. Federal Nat. Mortg. Ass'n, 119 F.3d 23, 26 (D.C. Cir. 1997); see also Koger v. Reno, 98 F.3d 631, 633 (D.C. Cir. 1996) ("Age discrimination is governed by the disparate treatment analysis developed in the Title VII context."). Under that framework, the plaintiff must first establish a *prima facie* case of discrimination. McDonnell Douglas, 411 U.S. at 802. If she does so, the burden shifts to the defendant to assert a legitimate, non-discriminatory reason for the adverse employment action. Id. The plaintiff must then "be afforded a fair opportunity to show that [the defendant's] stated reason … was in fact [a] pretext" for unlawful discrimination. Id. at 804.

The D.C. Circuit has stated, however, that at the summary judgment stage, it is "almost always irrelevant" whether a plaintiff in discrimination suit has made out a *prima facie* case. See Brady v. Office of Sergeant at Arms, 520 F.3d 490, 492 (D.C. Cir. 2008); Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (applying Brady, originally developed for Title VII claims, to ADEA claims). Once a defendant has proffered a legitimate, non-retaliatory reason for the employment decision, "the question whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'" Brady, 557 F.3d at 493 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510, 511 (1993)).

Here, there is no doubt Plaintiff suffered an adverse action when she was terminated. See Def. Statement of Undisputed Material Facts, ¶ 34; see also 29 U.S.C. § 623(a)(1). In addition, it is undisputed that Defendant has articulated a legitimate, non-discriminatory reason for terminating Blocker-Burnette – namely, that she was not qualified to perform the duties required of her in her new position in the ARC. See Mot. at 4 ("Because Plaintiff's prior position had been abolished and because Plaintiff represented that she was not qualified for her new assignment, Plaintiff was terminated from her employment with the agency."). This Court, therefore, "need not—and should not—decide whether the plaintiff actually made out a *prima facie* case under McDonnell Douglas." Brady, 520 F.3d at 494 (emphasis in original); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (when defendant offers evidence that plaintiff was terminated for legitimate, nondiscriminatory reason, sole remaining issue is "discrimination *vel non*") (citation omitted).

Instead, the Court's task here is to determine whether Blocker-Burnette has produced sufficient evidence for a reasonable jury to find that the District's asserted reason for terminating her was a pretext for age discrimination. See Brady, 520 F.3d at 494; see also Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). Since the Court is considering this question on summary judgment, the Court may grant Defendant's Motion only if the evidence, viewed in the light most favorable to Blocker-Burnette and drawing all reasonable inference in her favor, is such that "no reasonable jury" could find that the District's asserted reasons were pretextual. See Hamilton v. Geithner, 2012 WL 119134, at *5 (D.C. Cir. 2012) (citing Jones v. Bernanke, 557 F.3d 670, 674, 681 (D.C. Cir 2009)); see also Reeves, 530 U.S. at 148.

The primary reason the District gives for terminating Blocker-Burnette is that she herself represented that she was not qualified for the position to which she was assigned. See Mot. at 7

8

("Plaintiff's termination resulted from her own assessment that she was not qualified to perform the duties of the position to which she was transferred …."). Plaintiff denies ever saying anything to that effect. See Opp. at 2. She merely stated in an email regarding tasks she was asked to perform in her supervisor's absence that she had "never performed clinical treatment duties" and that her experience had "been mostly administrative and/or managerial." See October 2007 email exchange. She also indicated that she had "limited training on vouchers" and "no training as super user." Id. Blocker-Burnette claims that these statements do not express a lack of ability or qualifications to perform the required tasks; they simply indicate that she needed training in APRA's unique tools and methods. See Opp. at 2; Pl. Dep. at 71-72. Plaintiff did not "refus[e] to perform the duties assigned to her," as Fernandez-Whitney claims; rather, she stated she would do them as best she could. See October 2007 email exchange. The Court believes that Blocker-Burnette's email is subject to multiple reasonable interpretations. As the Court must not make credibility determinations or weigh the evidence at this stage of the litigation – but instead must draw all permissible inferences in Blocker-Burnette's favor – the Court finds that genuine issues of material fact remain for the fact-finder to resolve at a later date. See Czekalski, 475 F.3d at 363.

In addition, several comments made by Fernandez-Whitney suggest that her stated reason for Blocker-Burnette's termination may have been a pretext for age discrimination. Before Plaintiff lost her job with APRA, she and Fernandez-Whitney had developed a friendly relationship. See Pl. Dep. at 50. They would talk about their personal lives, and Fernandez-Whitney even took Blocker-Burnette's granddaughter to lunch to "mentor" her. Id. at 50-51. They also discussed work matters, and Fernandez-Whitney told Blocker-Burnette that "she was looking for fresh, new blood in the office," which Blocker-Burnette took to mean that "she

9

needed new, younger people." Id. at 51, 53. Fernandez-Whitney made similar comments to others. She said to Catherine Bego, a 65-year old Deputy Administrator (who was later terminated), for example, that she wanted a "more youthful appearance" in APRA's Executive Office. See Catherine Boddie Bego v. District of Columbia, Civil Action No. 08-654 (D.D.C. 2010), ECF No. 25, Exh. 5 (Deposition of Bego) at 47-48. On another occasion, Jennifer Mumford, former APRA Deputy Director of Operations, heard Fernandez-Whitney commenting that Bego still used a Rolodex even though no one uses them anymore. See Opp., Exh. 10 (Decl. of Jennifer Mumford), ¶ 11. Fernandez-Whitney added that Bego probably did not know how to use the computer at her desk. Id.

Defendant relies on Talavera v. Fore, 648 F. Supp. 2d 118 (D.D.C. 2009), to argue that these comments are "stray remarks," which are insufficient to create a triable issue of discrimination. Fore, however, has been reversed on that point of law. See Talavera v. Shah, 638 F.3d 303 (D.C. Cir. 2011). At issue there was whether USAID discriminated against the plaintiff on the basis of gender when it failed to promote her. Fore, 648 F. Supp. 2d at 123-24. The district court indicated that a statement by the decisionmaker that men at the agency "have a bond with each other because they've all served in the military" was merely a stray remark "unrelated to an employment decision involving the plaintiff." Id. at 132. Because of this, the court concluded that it was "'insufficient to create a triable issue of discrimination.'" Id. (quoting Simms v. U.S. Gov't Printing Office, 87 F. Supp. 2d 7, 9 n. 2 (D.D.C. 2000)).

The D.C. Circuit reversed the trial court's grant of summary judgment on the plaintiff's failure-to-promote, gender-discrimination claim, holding that the court had improperly discounted probative evidence. Shah, 638 F.3d at 310-313. Specifically, the Circuit held that the decisionmaker's statement was "relevant to [the plaintiff's] claim of gender discrimination" and

should have been "considered in evaluating whether the totality of the evidence shows the USAID's explanation was pretextual." Id. at 311. After considering the relevant evidence that the district court had excluded, the D.C. Circuit concluded that the plaintiff had presented sufficient evidence for a reasonable jury to find that the proffered reason for the non-promotion was pretext. Id. at 313. The Fore case and its subsequent history, accordingly, undercut Defendant's argument that isolated remarks unrelated to the employment decision at issue cannot create a dispute of material fact. On the contrary, the Talavera cases militate in favor of considering prior statements that could reasonably suggest discriminatory views on the part of the employer.

Defendant's other argument that Fernandez-Whitney's prior remarks are irrelevant is similarly unavailing. In its Reply, Defendant attempts to distinguish Threadgill v. Spellings, 377 F. Supp. 2d 158 (D.D.C. 2005), from the instant case. In Threadgill, the court stated that "the term 'new blood' by itself does not always connote age discrimination" as it has at least two possible meanings: it could refer to "people outside the team, both young and old," or it could "intimate the replacement of older employees with younger ones." Id. at 164. The use of the term must therefore be looked at in context in order to determine whether it could raise an inference of discrimination. See id. In Threadgill, the district court concluded that "a reasonable factfinder could infer that 'new blood' was synonymous with young 'blood'" because there was evidence that the employer used the "two phrases in tandem" and made other "subtle comments about age," including referring to a group of people as "'over the hill.'" Id. While the facts here are not identical to those in Threadgill, they are not so dissimilar as to dictate a different result. There is testimony that Fernandez-Whitney used the phrase "fresh, new blood." Combined with evidence that she made other age-related comments and terminated several employees over the

11

age of forty, this Court finds that a reasonable jury could draw an inference of age discrimination in this case. See Opp., Exh. 8-9, 12-13 (declarations of four individuals over age forty who were terminated by Fernandez-Whitney in spite of excellent to outstanding performance reviews); Mot., Exh. D (Memorandum from Fernandez-Whitney discussing terminations of seven individuals, at least six of whom were over age 40, purportedly due to "functional realignment"); see also Bego, 725 F. Supp. 2d at 35-36 (APRA employee's age-discrimination claim survives summary judgment based on Fernandez-Whitney's ageist remarks and alleged pattern of terminating qualified older managers); Buckley v. Hospital Corp. of America, 758 F.2d 1525, 1527-28 (11th Cir. 1985) (comments that hospital needed "new blood" together with desire to attract younger employees and multiple comments on plaintiff's age was sufficient evidence of discrimination).

Finally, the District contends that the Court should treat its statement of material facts not in dispute as admitted because Plaintiff failed to comply with Local Civil Rule 7(h)(1). Reply at 3-4. That rule requires a party opposing a motion for summary judgment to include a SUMF, citing to the relevant portions of the record. See LCvR 7(h)(1). Any facts identified in the moving party's SUMF and not controverted by the opposing party's statement may be assumed by the Court. Id. Because of the permissive nature of this rule and the leniency afforded to *pro se* plaintiffs like Blocker-Burnette, the Court will not treat Defendant's statement of facts as conceded. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (pleadings of *pro se* plaintiffs subject to less stringent standards than those of trained attorneys).

The Court, therefore, believes summary judgment is not warranted on Plaintiff's age-discrimination claim as it relates to her termination.

    2. *Discrimination on the Basis of Family Responsibilities*

Blocker-Burnette also contends that her termination was a result of discrimination on the basis of family responsibilities in violation of the D.C. Human Rights Act. Among other things, that statute prohibits an employer from discharging or otherwise discriminating against an employee based on her support of a person or persons in a dependent relationship. See D.C. Code §§ 2-1402.11(a)(1); -1401.02(12). Blocker-Burnette argues that she was fired, at least in part, because she was unable to attend a meeting with Fernandez-Whitney on the evening of October 12, 2007. See Opp. at 1-2; Compl. at 2-3; see also July 2011 email exchange between Blocker-Burnette and Brown; Mot, Exh. 10 (Declaration of Fernandez-Whitney, ¶ 17). The meeting was held after working hours, and Blocker-Burnette could not make it because she needed to take care of her daughter and her ill father. See Pl. Dep. at 70-71. She informed Brown, her direct supervisor, that she would not be at the meeting due to family obligations, and Brown later indicated that he had notified Fernandez-Whitney of that fact. See July 2011 email exchange.

The following Monday, Fernandez-Whitney talked to Blocker-Burnette about missing the meeting. See Fernandez-Whitney Decl., ¶ 18. She appeared upset and told Plaintiff that when she summoned her to a meeting, she expected her to show up. See Pl. Dep. at 90-91. Blocker-Burnette said that she had family responsibilities that had prevented her from attending the meeting and that she had informed Brown that she would not be there. Id. Fernandez-Whitney simply replied, "[W]e all have issues." Id.

Based on these facts alone, Blocker-Burnette contends that a reasonable jury could find that her termination constitutes unlawful discrimination on the basis of her family responsibilities. There is simply not enough evidence to support such a finding. For the Court to deny a motion for summary judgment, the nonmoving party must present more than "a scintilla

of evidence to support [her] claims." Freedman v. MCI Telecommunications Corp., 255 F.3d 840, 845 (D.C. Cir. 2001). While this is a low bar, Blocker-Burnette has failed to clear it here.

### B. Reassignment

In addition to alleging that her termination was unlawful, Blocker-Burnette also challenges her transfer from the Medicaid Division to the ARC. As best the Court can discern, Blocker-Burnette's argument is that she was reassigned to a "targeted" position in the ARC for discriminatory reasons. See Opp. at 26. She alleges that Fernandez-Whitney acted with "unfettered subjective discretion" in implementing the structural realignment – violating numerous "established procedures under the D.C. Personnel Rules and Regulations." Id. at 4-5. Even assuming this is true, Blocker-Burnette has not offered a shred of evidence that her transfer was motivated by discrimination. This is a situation in which a substantial office realignment occurred and Plaintiff's whole division was dissolved. In fact, Fernandez-Whitney set forth compelling reasons why this occurred. See Fernandez-Whitney Decl., ¶¶ 7-8 (noting, for example, that people with clinical backgrounds were not working in a clinical capacity in spite of shortage of clinical staff in agency and that a Medicaid Division existed even though APRA not approved for Medicaid reimbursement). Blocker-Burnette has not shown that this explanation was actually a pretext for discrimination. As such, no reasonable jury could find that her transfer amounted to unlawful discrimination.

## IV. Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order that will grant in part and deny in part Defendant's Motion for Summary Judgment.

/s/ *James E. Boasberg*
JAMES E. BOASBERG

                United States District Judge

Date: <u>February 10, 2012</u>